We have an admission this morning. Mr. Schneider, would you come forward to the podium, and I'll invite Judge Reina to decide whether you're... Mr. Schneider, or Jesse, you know, they say that time goes by quickly when you're having fun, but also when you're working hard. This past year must have really flown past quickly for you because of your hard work. You produce excellent work product for not only my chambers, but for the entire court as a whole. And I've observed the respect that you've earned from among your peers, and I think that this is a testament to who you are, who you are as a practitioner. I wish you the best of luck in the future, and I know now that before me stands a man in the well of this court who will represent well the legal profession, and that will do well. So, my colleagues, I move for the admission of Jesse T.H. Schneider, who is a member of the bar and is in good standing with the highest court of Texas. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Well, we receive the motion. The panel will take a vote. I would vote in favor. All right, I do believe that the motion is unanimously granted. Ms. Harrington, will you administer the oath? Of course. Do you solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court upright and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the bar of the United States Court of Appeals for the Federal Circuit. Thank you. Thank you, Mr. Schneider. Welcome to the bar of the court. Thank you. We shall proceed with the cases scheduled for this morning. The first argued case is number 15-16-01, Robert Clash Healthcare System against Cardiacom, LLC. Mr. Davies. May it please the court. Back in 1997, monitoring of the chronically ill relied on telephone calls. What's the point here of the claim constructions, which don't, as I've reviewed them, don't really seem to make any difference in the case? They seem to be arguing about something which is not something which affects whether the prior art renders this obvious. Happy to answer that, Your Honor. The claim constructors do affect analysis. Proactively initiate, for example, on the 420. How does that affect analysis? Without proactively, all they have is Talman, and the nurses in Talman are not proactively doing anything. They may be initiating, but they're not initiating in anticipation of anything. So they're not doing anything proactive. And so without, you know, if we're right on the proactive initiation, there's no way to know. What is your construction of proactive? So our construction is the same as their experts' construction, actually, Your Honor. It's that in anticipation before something occurs, something urgent in this context. Because what you have here is chronically... Why isn't Talman doing that? Because what happens in Talman, they're already scheduled callbacks. They're not in anticipation of anything happening. The callbacks are made... But the callbacks are being made before there's a medical crisis. They're not in anticipation of that crisis. I don't understand. Why don't you address the other two? Doesn't proactive go to the conduct in anticipation more to a mental state? If the contact is made, is initiated, why isn't that proactive? I'm having the same difficulty, I think, that Judge Dyck is expressing. So the word proactive is used throughout the patent. And it has to have content. If I initiate an action, why isn't that being proactive? It's not proactively initiating. The word proactive was used differently in this patent, which is matter. We're not talking about how it's used in the English language, how it's used in these claims and in this patent. The title of this patent is proactive health management. The field of the invention is proactively managing a group. The object of the invention is proactively communication. And it's not about initiating because there are ways to initiate contact as in Talman, which isn't proactive. The whole point of this invention was to have chronically ill patients that may be under a self-care plan that requires checking in. And the nurses initiate that check-in. But to do it proactively, to check in before there's a problem, that's the key. Why isn't that happening in Talman? They're initiating before there's a problem. Let's put it this way. In Talman, two individuals... Talman doesn't describe a situation where there's an initiation in response to a crisis, right? Talman, no. Well, so what's the difference? Because we're doing it in response... Under our invention, the providers get to prioritize among patients and pick which people to call. And so they pick the people that are most sick, the ones who most need the care. That's the proactive initiation. In Talman, there's no prioritization. It's just whoever's next on the list gets called. And so the whole point of this invention is to rationalize resources so the providers can proactively decide who to reach out to. What about the other two client constructions? I'm having difficulty in seeing how those affect anything. In terms of the data merge and script program, those things are described in your own specification as well-known and standard. How are you using that to distinguish the prior art? What's the point here? So on those constructions, I think the prior art, even under the board's constructions, unlike the first one we were talking about, under the board's construction of those two terms, the prior art does not teach what happens here. So just to get a little more specific, data merge... But how does the claim construction affect whether the prior art renders this obvious? How does it make a difference? It makes it more clear that the prior art does not apply. How? Well, so data merge, for example, what they say is that it's any combination of two pieces of data. What we say is merge is like a mail merge. It has to... Well, it has to result, under the terms of the patent, and the board didn't dispute this, it has to result in a customized script program. Yes, for sure. Right. So what do the claim constructions have to do with it? So the other way to come at this, Your Honor, is if you think it's close, we can talk about the commercial success. This court's case... No, forget about it. Put that aside. I mean, it's clearly relevant, but I'm trying to figure out what you're arguing about claim constructions here, and I'm trying to figure out what difference they make. So they're a... How is it that, under your claim construction, a piece of prior art on which the board relied becomes irrelevant? Well, irrelevant... I'm not sure we use the word irrelevant. It's distinguishable, so... Well, how does it distinguish prior art on which the board relied? So on the 192, the prior art is called RIPE, and it's a form that is used when customers go to a restaurant, and it's a form for people to fill out the answers. And the question is, is that like our... Is that a data merge program if all the person is doing, the second person is taking that form and changing the form? We say that is not a data merge program. The board says, well, any combination of two sets of data meets the claims. And we say, fine, let's take that construction. We're still not combining two sets of data in RIPE. You only have one set of data. You need a program that does the data merging. We're saying, well, there's no program in RIPE. So we have the no program argument, and we have the no two sets of data argument. This only relates to RIPE and none of the other prior art? The data merge, yeah. The 192, RIPE's the key prior art, for sure. Okay. What about your argument that, with respect to the secondary considerations, that somehow you don't have to show for commercial success that the patent was being practiced? What case holds that? We cited a lot of cases, Your Honor. Just give me a minute. Rambis, Rambis, Rambis Specialist Power Integrations, for example, Your Honor's recent case. There is no showing in those cases that each element of the claim is a mechanism. No, but there's no language in those cases that says you don't have to practice the prior art to show commercial success. There is reasoning. There's reasoning, Your Honor. Power integration's a case. Is there any case that holds that commercial success is relevant if it doesn't practice the prior art? You're using the phrase practice the prior art. I mean, I'm sorry. It doesn't practice the patent. I'm not sure what you mean by that. Practice the elements. They have cited zero cases that say you have to practice each element. And Rambis and Power Integrations and Spectralytics, they do not require proof of practicing each individual element. It would not work. I mean, ONCO, Your Honor, that is a good example, I think, of why you need a test. There definitely has to be a test. You can't just come up and say commercial success, we win. You have to connect the commercial success to the patent. So if that's the question, you have to do that. The question is at what level of specificity you have to do that. Well, why don't you have to do it in terms of the patent's level of specificity? Because if that was the requirement, the requirement would never, ever be met. Because things like advertisements don't talk in terms of individual specific elements, nine, ten points of a claim. So when in Power Integrations, you know, the fact that you have superior technology is relevant to showing the patent is non-obvious. Because to step back, that's the whole point of the commercial success and why Lonerhan likes it so much. It's objective, right? There's not lawyers arguing about it. It's objective evidence. What we have here is ABC News highlighting this product. What we have here are medical journals highlighting the particular features of our patent. And what we're saying is those show they were not obvious. There's no counter-narrative. It's not as if there's another. Like in Alcoa, your Honor, there was the fact that that was the Invisalign case where the braces were clear. And that commercial success were driven by the fact that they were clear. And that wasn't in the patent. Sure, that's fine. That's not what we're arguing. But if you advertise something which doesn't practice the patent, how is that relevant? You keep saying the phrase doesn't practice the patent. The inventive features, if you prefer that phrasing, were highlighted. I'm talking about the claim limitations. I'm talking about the claim limitations. If what you're doing doesn't satisfy the claim limitations, how is it pertinent? It's pertinent because it shows that the inventive features were not obvious. That's what these cases say. Rambus, Spectralytics, Power Integrations. There's no case the other way that says we're not going to look at this because you haven't shown individual elements. That's not the test and it wouldn't work. You're not going to find Peter Jennings on the news talking about a nine-point test. What you have is... Let's go back to the claim construction argument. Epley argues that you waived these arguments. Can you address that? Yeah, I'm happy to. So just procedurally what happens is we make an argument at the institution stage about claim construction. You didn't renew those arguments at the trial stage, correct? At the final determination stage. What we said was, for purposes of this proceeding only. And that's appendix 11-289 and appendix 677. We just said, for purposes of this proceeding, for purposes of this 60-page brief, we're not going to repeat our arguments. It would be an unfortunate rule from this court to say the parties at the final stage have to then re-brief everything that they've lost at the institution stage. It's just like in the Markham context, Your Honor, where, yeah, we may pick one or two and re-litigate, but basically you take lumps and you keep moving forward. Yeah, but your analogy is an interesting one, because in the Markham context, if you agree to a claim construction, you have it. It's not preserved. It depends on the terms of the agreement, Your Honor. If you said, for purposes of appeal, I mean, for purposes of this litigation, I'm not, at this stage, I'm not going to challenge it. But we said, for purposes of this proceeding only. Yeah, if you said at a Markham proceeding, for purposes of this litigation, I'm not challenging the claim construction, that would be a waiver, wouldn't it? Well, you used the word litigation. If you said for purposes of this at the district court stage, it wouldn't be. Well, that's not what you said here. Well, we said for this proceeding. If you said in the district court at a Markham hearing, for purposes of this proceeding, we accept the claim construction, that would be a waiver, right? I'm not so sure, because you have arguments about what proceedings matter. But also, these are glaring errors. I mean, it only goes to two claims in a trial. Are we talking about two separate proceedings here? Yeah, in my view. You have the institution stage, and then you have the trial, or the final determination stage. Shouldn't you at least renew an objection you earlier made in the initiation stage to preserve your claim constructions? I don't see that you, it's murky here. But what's not murky is your argument that you could win, even under the. . . It's certainly not a linchpin of our case. As we started out talking about, the two claim constructions the waiver is relevant to, data merge program and script program, there are third arguments. I mean, if you want to find a way, it doesn't affect our bottom line point. I do think it's not the right rule to require parties to relitigate issues again in a 60-page brief at the IPR. That would impose a burden on both the parties and the system. I don't think that's the contention. The contention is not that you have to re-brief it for 60 pages. The point is you have to preserve it. You could do it in a sentence. So instead of saying for purposes only, we should have said for purposes of this IPR only? We continue to challenge the claim construction, but we're proceeding. . . That's how I read that. I don't think that's being fair to the intent here. But the errors are glaring. It's data merge. The Cardinals are not really defending the things that they're saying are waived. They're not defending the substance of those claim constructions. They have very bad construction, and that's what I've highlighted. But we really don't need them. To come back to secondary considerations, another point to consider is that there's just no counter-narrative here. And that, I think, is the thing to keep in mind. It's not like there's another explanation for the excess. When Peter Jennings talks about the health buddy, when he talks about the customized scripting program, when he talks about when all the literature talks about the group charts, there's no other reason except for our invention. Let me ask you, do you want to distinguish among the various patents that are before us? Would I like to distinguish among the various patents? Yes, you argued them separately, but it's the sense that they rise and fall together. So it really depends on how persuasive you find the evidence of praise. Because I think this is an unusual case of objective success, where you have Peter Jennings on the nightly news and all the literature. So I think on that basis alone, I think the PTEF should not have invalidated any of these patents. So that would be one way to go. The 420, the claim contraction error, has no waiver issues. It's glaring, and it doesn't come close to the prior art. So I would do the 420 in the second bucket. And then the latitude may rise and fall, depending on how precise you want to be with the prior art. The Peter Jennings statement, you view that as industry praise? That's how we characterize it, yes, Your Honor. It's certainly praise. I'm not sure I can see anything in the cases at that level. It's a two-minute video. I urge you to watch it. It is ABC Jennings, nightly news. It's the health buddy. It's the customized scripting feature. It's the before. It's the after that Lerner and Hand wants. Lerner and Hand objective considerations test wants the world before and the world after. And Peter Jennings gives you the world before, where people were winding up in the hospital prematurely because there was no proactive communications. And then this great device, and the system comes along, and there's interviews about it. Okay. Thank you. We'll save your regrettable time, Mr. Davies. Thank you. Mr. Fleming. Good morning, and may it please the Court. Mark Fleming with Daniel McDonald on behalf of Cardiocom. I would begin where Mr. Davies ended, which is with commercial success. The legal test is the one that Bosch quotes twice in its blue brief, which is that to show a prima facie case of nexus, the patentee has to show both that there is commercial success and that the product that is commercially successful is the invention disclosed and claimed in the patent. Bosch quotes that language. It comes from this Court's decision in Crocs, in turn quoting this Court's decision in D'Amico. And as the Board correctly found, Bosch didn't prove either of those. And there's a reason it has to be the patented invention and not just one or a couple of features in a claim of the patented invention. And that's because, as the Court said in D'Amico, the rationale for giving weight to so-called secondary considerations is that they provide objective evidence of how the patented device is viewed in the marketplace. And contrary to my friend's claims, this Court has said that several times. It says it specifically in Ashland Oil, which is a case that Bosch cites in its brief. In footnote 42, there's a lengthy discussion about the need to show that the supposedly successful products actually practice the claimed invention. The Court said it in J.T. Eaton, which we cite, and in numerous other cases, and none of the cases that Bosch has cited to you this morning hold to the contrary. Besides, the standard that they are articulating is not one that is workable in practice. They seem to be articulating some kind of gist of the invention or point of novelty argument. But they don't tell the Court how you're supposed to pick which features are important for purposes of commercial success. Surely they can't just take one of them. Could you present evidence that the product that Peter Jennings was praising was not covered by the claims that are asserted here? We did not, Judge Rainey. It was not our burden to do so. It was the patentee's burden to show that they did practice the claimed invention. It's their product. It's not our product. We don't know what the health buddy does beyond what Bosch chooses to tell us. Neither did the Board. And that's why the Board asked this question repeatedly at the oral hearing in these cases. So apart from whether we're talking about a product that's being practiced or not, isn't the real issue here one of nexus? Yes, Your Honor. That's exactly what it is. They have failed to make a prima facie case of nexus, which requires proof both of commercial success that the health buddy is, in fact, successful. And there's a significant question on that. The Board ruled against them on that, too. But they haven't shown to begin with that the health buddy actually practices any claim of the patents that are at issue in this case. And the Board was surprised by that. The reason they didn't do it is because they believed, erroneously, that they didn't have to.  Now I understand that Bosch is trying to cobble together some evidence on appeal to try to satisfy this court. First of all, an effort to do that now is waived. It's too late because they didn't prove the case to the Board. And second of all, fundamentally, there is no evidence that the health buddy practices any claim of these patents. Bosch relies on the group overview chart, but the 420 patent claim is more than just the chart. And notably, the chart is not what they are now contending is novel. They couldn't patent a chart. The Board found that Crawford disclosed all the elements of the supposed group overview chart. The only thing that they're now appealing as purportedly novel in the 420 is this idea of proactive communication. And I assure you, Peter Jennings does not mention proactively initiating a communication with said patient, nor does he talk about I don't think that Peter Jennings has to mention it if he's talking about a product. You are absolutely right, Judge Dyke. But there has to be something linking, whether it's the praise or the commercial success, to the patented invention. Normally, this would be done by expert. It's not showing that the thing being praised did practice the patented invention. Correct, Judge Dyke. And normally, that would be done by product specifications, by expert testimony. Let's just assume that you are not correct in terms of where the burden of proof reposes, because we know that the statute is This is an issued patent. It's not in prosecution before the office. It may very well be that the burden does not initially repose with them on any aspect. So if, as we think it through, that turns out to be the case, how confident are you that your burden has been met with respect to commercial success? I don't want to challenge overly the premise of the question, Your Honor. If the Court were to rule that all that the patentee has to do I think the point is that you've misspoken a couple of times in speaking about the burden of proof. The burden of proof always rests on the challenger. It's the burden of production of evidence on commercial success with the nexus that rests on the patent. Thank you, Your Honor. That is exactly right. And to be precise, the burden of showing the prior art that discloses the elements and renders the claims obvious, that is our burden. The burden of coming forward, Prima Facie, is with the challenger. On secondary considerations, Judge Newman, no. The burden of coming forward with secondary considerations evidence is on the patentee. During examination, that's correct. But now we have an issued patent. If this were before the district court, the burden would be on the challenger in the first instant as to every aspect of the challenge, would it not? I believe under D'Amico, Your Honor, once the challenger has made a Prima Facie case of obviousness by showing that the elements are disclosed in the prior art and there's a motivation to combine, if the patentee wishes to rely on secondary considerations, the patentee has an obligation to come forward with the two aspects of evidence that I mentioned at the beginning, which is evidence that the products were commercially successful and that they practiced the claims. If the patentee does that, then the burden of production shifts to the challenger to show. Yes, the burden of production shifts. Shifts to the challenger at that point. However, we have the issued patent. And in D'Amico, the issue was not so much where the burden rose, but that it was the invention as a whole that was at issue in terms of commercial success. That is correct. In D'Amico, there was no dispute that the products did practice the claimed invention. It was a paving stone, as I recall, and there was no dispute that D'Amico was selling the patented paving stone. In cases where there has been a dispute, like Ashland Oil and like J.T. Eaton, this Court has been very clear that it is the patentee's burden to show that the supposedly successful products actually do practice the claimed invention. It would have to be that way. So where is your prima facie case of obviousness then had nothing to do with the commercial success? It was the prior art? As the challenger, the prima facie case is the prior art. Let's turn to those issues. I'm happy to do that, Judge Newman. So as the questions to my colleague suggested, we believe that most of the claim construction issues in this case are waived because they were not preserved. Not only did Bosch remain, but this isn't a case simply where Bosch remained mute. They affirmatively stated agreement with the Board's constructions as stated in the Decision on Institution. In fact, if one looks at the hearing transcript on page 11643 of the appendix, Bosch's counsel says there's no dispute on that construction when talking about the data merge program construction. And then there's more than that, because the Board's final written decisions specifically make a finding that the parties have agreed on the constructions as stated in the Decision on Institution. And there was no petition for rehearing. There was no request for clarification. There was no statement that, oh, we only meant that for purposes of the trial stage, but we're going to appeal them. That finding has remained as it is. So we think that those constructions as stated in the Decision on Institution are now final, and there's no need for this Court to engage with them. The only construction as to the 420 that is asserted is the one having to do with proactively initiating a communication. That's not a method step in the patent. It is a statement of capability. The system of … If Bosch says for purposes of this proceeding, aren't they acknowledging that there's two stages to this proceeding? And for this one, we're going to make the following arguments, given that there's already been a ruling on claim construction. What would that incorporate? Or what should we view that as referencing back to the arguments that were made at the institution stage? I think that if a litigant tells a tribunal that we're accepting a preliminary ruling for purposes of this proceeding, that means that the tribunal does not commit error when it relies on those preliminary rulings. If Bosch meant something else by it, then the moment those final written decisions came out saying the parties agreed to our claim constructions, they should have been in there with some kind of statement of clarification or a petition for review. Do you think from your statement, we continue with our objection that we made, we continue with our claim constructions that we made at the institution stage and move on to this construction or something similar to that? A simple sentence would have done it? That at least would have made this a harder case from the argue waiver, for sure. I think the board would have had to decide whether that is sufficient to preserve an argument at the trial stage, and that would be a matter for the board's discretion, which this court would review for abuse. But we're not there. Here we have a statement saying not only for purposes of this proceeding we accept them, but then in the oral hearing there's no dispute on that construction, and the board relied on that. The litigant cannot lull the board into a false sense of security, saying I'm accepting and there's no dispute, and then have an opinion come out that says the parties agree to it, and then all of a sudden appeal and say, oh, you know, please, court of appeals, you need to fault the board for not intuiting that we were maintaining the constructions. But the question isn't here whether the board should have renewed its own argument or its own analysis, its institution analysis. The argument is whether the prior claim constructions were preserved for appeal. Well, but the point of preservation is to give the board a full opportunity to assess the litigant's arguments that were made in the first instance. But it had been at the institution stage. Well, there was a preliminary finding, and then the boards invited Bosch to brief anything further that it disagreed with. That's why, I mean, in the, if you look at the decision on institution. The board could change its claim constructions. The board certainly can, and it does routinely in cases. In fact, on one of the decisions on institution on A54 of the joint appendix, the board specifically says for the purposes of this decision, we construe a data merge program to be a program that combines two or more sets of data into one. They're clear that they're doing it for purposes of this decision, and the board certainly, Judge Dyke, does change its mind and would have been open to doing that had the arguments been made. The point is that Bosch simply didn't give the board a chance to do that. Judge Newman, you asked me about the merits, and I'm happy to discuss waiver more, but the one merits argument that we think is preserved is the proactively initiate, but we think it's incorrect on the merits. We think the board got that exactly right. To initiate just means to start, and to start the communication proactively means that, unlike in the prior art systems, which the patent criticizes, where the clinician waits for the patient to do something, either come into the emergency room or hand in most recent medical data, the system here, just like the Tolman system, allows the clinician to reach out without having to react to something that the patient has done. That's doing it proactively. There's nothing in the claim, and certainly nothing in the specification, that limits this kind of communication to a situation where there is, or there's likely to be, an urgent medical need. The deciding factor is that the patient has been out of contact for a long time. That happens in Tolman as well, and Judge Dyke, the import of your questions, I think, teed this up correctly, which is that even under Bosch's claim construction, Tolman does disclose a call that is not reactive to something that the patient has done, but rather is proactive, and in that sense, we think this claim construction, even if there were an error, which we don't think there is, would be a harmless error, and so the decision of the board could be affirmed on that basis too, just like this court did in Watts, and like the court did in the Man-Machine case, which Mr. Davies put in by a 28-J letter. Even where the claim construction was changed, it was still acceptable to affirm obviousness on some counts, because the result would not have changed even under the new claim construction. Unless the court has further questions, we would respectfully submit that the judgments in all three cases should be affirmed. Thank you, Mr. Forney. Thank you, Your Honor. Mr. Davies, you have your rebuttal time. Maybe I'll start where we ended with Tolman, and I think it's notable it came at the very end of the argument there. The Tolman reference does not involve proactive initiation. As I was trying to explain earlier, two patients could get the same phone call at the same time under Tolman, even if one is now very sick and the other is not. And the point of our system is to allow the providers to proactively initiate contact to the one who's getting sick and not waste time on the one who's fine. But your claim doesn't cover just people who are really sick, right? It's a system that had proactive initiation of communication, and it is designed for chronically ill people, so people who already have issues. But yes, it is focused on urgent care, and that's why their expert used that word, and that's where the savings of emotional energy and money comes from. It's picking up people who became chronic and going into urgent, and that's why proactive is important. But we don't need the word urgent. We just need proactive to have any meaning, and of course it has to have some meaning, and then Tolman just doesn't apply. Second, on the question of the rigor or the strictness of this commercial evidence test, I want to give the Court three sites. Our expert said we met this test, so that's at Appendix 12607, 2779, and 7565. Our expert said the element-by-element was met by our device, but we don't think we needed to do it, and we don't. And they haven't cited a single case that says you have that requirement, and as Your Honor's question about pedogenic suggested, that is not the way commercial success or objective evidence of praise is going to be developed in the real world, and that's what this objective evidence test is about. It's about the real world. I mean, the cases, if you look at RANDIS, you look at all these cases, they do not require real world evidence to have specific elements. Your expert said that the system or method praised by Peter Jennings met the claim limitations? Our expert said each element was met, yes. I can know. Really? Thank you. Was he referring specifically to the health buddy device? Yes. I'll just pull that up. Any add-on question there? Where is it? The one that's popping out in Appendix 12607. It's not in the Appendix 12607. Let me try a different one. 7565. 7565. Your Honor, I can submit it separately. Did you make that argument in your brief? Yes. Where? I'm sorry about that, Your Honor. I don't know why it's not in there. It's not in there. I'm sorry to make an argument. It's in the rebuttal argument that you didn't make in your brief. Okay. If that happened, Your Honor, I apologize. I know it's in the expert report.  On the fly, it's hard, Your Honor. Okay. If we need it, we'll find it. That's fine. I'm sorry. I didn't want to give them extra time. I didn't mean to do that, obviously. Yes, okay. Anything else? No. Thank you. All right. Yes. That makes sense. Thank you. Thank you both. The case is taken under submission.